IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAMES STEDMAN,                    )

    PLAINTIFF,                    )

VS.                               )          CV-01-H-1675-S

BIZMART, INC., a corporation,     )

    DEFENDANT.                    )

**ENTERED**

SEP - 3 2002

## MEMORANDUM OF DECISION

The Court has before it the June 28, 2002 motion of defendant Bizmart, Inc. for summary judgment.  Pursuant to the Court's July 1, 2002 order, the motion was deemed submitted, without oral argument, on July 29, 2002.

### I. Procedural History

Plaintiff James Stedman commenced this action on July 3, 2001 by filing a complaint in this Court alleging violations of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq.  Plaintiff contended that defendant's alleged conduct constitutes (1) creation of a hostile work environment and (2) constructive discharge.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted

evidence[1] in support of its own motion for summary judgment and filed a supporting brief on June 28, 2002.  On July 22, 2002 plaintiff filed evidence[2] in opposition to defendant's motion for summary judgment.  On July 29, 2002 plaintiff filed a brief in response to defendant's motion for summary judgment.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine

---

[1]Defendant submitted: excerpts from both depositions of James Stedman with attached exhibits; excerpts from the deposition of Kevin Lane with attached exhibits; excerpts from the deposition of Lisa Milano; affidavit of Kevin Lane; and affidavit of Lisa Milano; unemployment compensation decision.

[2]Plaintiff submitted: the deposition of Kevin Lane; the second deposition of Jim Stedman; the deposition of Lisa Milano with attached exhibits; statement by Kevin Lane regarding 11/13/00; statement by Kevin Lane regarding 12/5/00; 10/27/00 rebuttal of performance review; 12/11/00 letter from James Stedman; 10/31/00 e-mail from Joseph Grimsic; 10/30/00 PowerMax III engineering report; 11/9/00 e-mail from Jim Stedman; 11/15/00 e-mail from Tonja Milkovich; 07/17/00 e-mail from Robert McGonagle; 11/15/00 e-mail from Jim Stedman; and 10/23/00 e-mail from Robert Thomas.

issue of material fact.  See Celotex Corp., 477 U.S. at 323.
Once the moving party has met his burden, Rule 56(e) requires the
nonmoving party to go beyond the pleadings and by his own
affidavits, or by the depositions, answers to interrogatories,
and admissions of file, designate specific facts showing that
there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material
and which are irrelevant.  See Chapman, 229 F.3d at 1023;
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All
reasonable doubts about the facts and all justifiable inferences
are resolved in favor of the non-movant.  See Chapman, 229 F.3d
at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th
Cir. 1993).  A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears
the burden of proof on the issue at trial.  See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real
Property, 941 F.2d 1428 (11th Cir. 1991)(en banc).  If the moving
party bears the burden of proof at trial, then it can only meet
its initial burden on summary judgment by coming forward with
positive evidence demonstrating the absence of a genuine issue of
material fact; i.e. facts that would entitle it to a directed

verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come

4

forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Defendant, Bizmart, Inc. is a wholly owned subsidiary of OfficeMax.  (See Lane Aff. ¶ 2.)  OfficeMax is a retail discount superstore chain that sells office supplies, business electronics, software accessories and office furniture.  (See id.)  Defendant hired plaintiff on March 27, 2000 as an industrial engineer for its distribution facility in McCalla, Alabama.  (See Stedman Dep. Vol I at 6, 12, 15.)  This facility was not complete when he was first hired; as a result, plaintiff trained for a short period at another OfficeMax distribution facility in Hazelton, Pennsylvania.  (See Stedman Dep. Vol. II at 15-16.)  Plaintiff reported to the McCalla facility in June of 2000 where Kevin Lane was his immediate supervisor.[4]  (See id. at 48-49.)  Plaintiff also reported to the Director of Logistics

---

[3]Facts are undisputed unless otherwise expressly noted. Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

[4]Kevin Lane was hired shortly after plaintiff but Lane was plaintiff's only immediate supervisor while at the McCalla facility.  (See Stedman Dep. Vol. II at 48-49.)

Industrial Engineering, Thom Rogers, who worked at corporate headquarters in Ohio.  (See id. at 48-49.) Plaintiff's primary job responsibilities were overseeing the completion of construction and the slotting of products.[5]  (See id. at 82-83; Lane Dep. at 26, 41, 84.)

Plaintiff was diagnosed with diabetes in 1998 as a result of his October 31, 1996 liver transplant and the medications he is required to take to keep his body from rejecting the organ.  (See Stedman Dep. Vol. II at 51, 64-65.)  He takes medicine for his diabetes but does not have to administer shots to himself for his condition.  (See id. at 51-52.)  Plaintiff was diagnosed with job stress in September 2000 and was given medication for both job stress and depression.  (See id. at 53-54.)  Plaintiff was first diagnosed with depression when he was eighteen years of age, after which time he was treated at an inpatient facility.  (See id. at 54-55.)  After being released from this facility, plaintiff was not treated for depression again until the late 1970's when he saw a psychiatrist who provided him with therapy for depression.  (See id. at 56-60.)  In addition, plaintiff was diagnosed with problems with mental functioning in 2001[6] after he

---

[5]Slotting of products is the computerized determination of where merchandise will be unloaded and how it will flow through the distribution center to be shipped to OfficeMax stores.  (See Lane Dep. at 43-45, 98.) Through slotting the warehouse management computer system electronically receives product, informs how the product is to be stored, pulled from inventory and shipped.  (See Stedman Dep. Vol. II at 13; Lane Dep. at 59-60.)

[6]The mental functioning problem is related to the liver transplant plaintiff received in October of 1996. (See Stedman

left his employment with OfficeMax.  (See id. at 62-63.)

When first hired by OfficeMax, plaintiff informed Human Resources Manager Lisa Milano that he was a liver transplant recipient.[7]  (See id. at 70-71.)  Plaintiff also informed Joe Desmond and Thom Rogers of his condition.  (See id. at 69, 72.) Additionally, according to plaintiff, shortly after Kevin Lane came to OfficeMax, plaintiff informed Lane that he was a liver transplant recipient and diabetic in the event a paramedic was ever called to the facility.  (See id. at 68-69.)  Plaintiff testified that Lane responded with "we're not going to worry about that" and walked away.[8]  (See id. at 70.)  At the time plaintiff informed Lane of his diabetic condition and transplant status, however, plaintiff did not require any accommodation to perform the essential functions of his job.  (See id. at 72-73; Ex. 8 to Stedman Dep.)

In September of 2000 the expectations of Kevin Lane and plaintiff's work volume became greater than plaintiff could perform.  (See Stedman Dep. Vol. II at 10-11, 20-22, 73-74.) These expectations included finding and correcting errors in the data warehouse management computer system and other tasks that

_____

Dep. Vol. II at 64-65.)

[7]Plaintiff testified that he informed Ms. Milano at a restaurant in Hazelton, Pennsylvania, that he was not allowed to drink because he was a liver transplant recipient.  (See Stedman Dep. at 70-71.)

[8]Kevin Lane denies having this conversation and claims that he learned of plaintiff's liver transplant through a conversation with Lisa Milano.  (See Lane Dep. at 133.)

plaintiff believed were more systems-oriented as opposed to traditional industrial engineering tasks.  (See id. at 10-13, 81-82, 85.)  When plaintiff asked Lane about performing what plaintiff believed were more traditional tasks, Lane told plaintiff that they needed to have the warehouse computer system data in the facility first straightened out.  (See id. at 86-87.)  However, this data was never straightened out during plaintiff's employment.  (See id. at 87.)

At some point in his employment,[9] Plaintiff claims that he told Lane that he felt overwhelmed by his job.  (See id. at 73-74.)  During this conversation, however, plaintiff did not bring up any alleged disability.  (See id. at 74.)  Plaintiff further testified that he asked Lane for some assistance and Lane provided plaintiff with a temporary employee to assist him.[10]  (See id. at 75.)

In late September of 2000 plaintiff experienced chest pains at work and drove himself to the hospital where he was admitted for stress related complications.  (See id. at 171.)  He was off of work for one week due to stress.  (See Milano Dep. at 29-30.)  After plaintiff returned from this leave, plaintiff claims that

---

[9]Plaintiff testified that he cannot remember when he had this conversation with Lane.  (See Stedman Dep. Vol. II at 73-74.)

[10]Some disagreement exists regarding the identity of this person.  Plaintiff testified that a temporary employee did assist him for a while, but he could not remember his full name at the time of his deposition.  (See Stedman Dep. Vol. II at 76.)  However, in his brief, plaintiff's attorney disputes the fact that defendant provided plaintiff with any assistance.  (See Pl. brief at 6.)

Lane asked him to step down from his job and informed plaintiff that Lane "was not going to be responsible for affecting someone's health."  (See Stedman Dep. Vol. II at 93-96.) Plaintiff informed Lane that he could handle his job as industrial engineer and he was not interested in stepping down, but he was open minded to other positions. [11]  (See id. at 95-96.)

Plaintiff testified at his deposition that he seldom had direct contact with Lane and that he learned of Lane's job performance expectations in staff meetings or when Lane would stop by his office to ask plaintiff questions.  (See Stedman Dep. Vol. II at 24.)  Plaintiff recounted times when Lane "harassed" and "threatened" him by asking plaintiff in front of a group of employees the answer to a question and showing disgust if plaintiff did not know the answer and that Lane stopped by plaintiff's office and asked in a loud voice whether plaintiff had completed certain projects.  (See id. at 87-92; Ex. 9 to Stedman Dep.)  Plaintiff also stated that Lane once timed him on his ability to finish a computer system entry.  (See Stedman Dep. Vol. II at 88-89.)  Additionally, plaintiff testified that Lane insensitively inquired about plaintiff's stepmother after she passed away and asked plaintiff to work the Saturday following her death.[12]  (See id. at 172-73.)

---

[11]Lane denies ever having this conversation with plaintiff. (See Lane Dep. at 137-39.)

[12]Plaintiff did not attend his step-mother's funeral and did not request any time off or request not to work on the Saturday

In October of 2000 plaintiff received a "below expectations" rating on his mid-year Performance Evaluation, covering his job performance from April to September of 2000.  (<u>See</u> <u>id.</u> at 122; Ex. 11 to Stedman Dep.)  The comments on this evaluation reflected Lane's belief of plaintiff's continued lack of understanding of the slotting process.[13]  (<u>See</u> Lane Aff. ¶ 7.) Plaintiff informed Human Resource Director Lisa Milano that he was shocked by the low rating on the evaluation and did not agree with it.  (<u>See</u> Stedman Dep. Vol. II at 102-04.)

Following this evaluation, Lane issued Plaintiff a Performance Counseling on November 3, 2000 that addressed several of plaintiff's continued performance problems.  (<u>See</u> Stedman Dep. Vol. II at 123; Ex. 13 to Stedman Dep.)  These continued performance problems primarily concerned plaintiff's difficulty with the slotting process.  (<u>See</u> Ex. 13 to Stedman Dep.)  Lane attached a list of specific tasks for plaintiff to focus on mastering as well as expected completion times for the tasks. (<u>See</u> <u>id.</u>)  Lane claims that he issued this Performance Counseling in an effort to correct plaintiff's performance problems and expected to see immediate improvement.  (<u>See</u> Lane Dep. at 175-

---

following her death.  (<u>See</u> Stedman Dep. Vol. II at 171-74.)

[13] The comments on the evaluation included: "slotting strategies are not fully understood . . . . still revisiting these strategies in late September"; "Jim is challenged to provide 'timely' internal customer service support.  Some of this is due to a lack of system knowledge/understanding"; and "Jim tries to respond with a sense of urgency, but lacks the system understanding to respond in a timely manner."  (Ex. 11 to Stedman Dep.)

178.)  Plaintiff again complained to Milano and told her he thought that the counseling was unfair.  (See Stedman Dep. Vol. II at 105-06.)  He also submitted a rebuttal to his October mid-year Performance Evaluation and this Performance Counseling on November 7, 2000.  (See id. at 106-07, 122-23; Ex. 12 to Stedman Dep.)

Plaintiff's performance problems did not immediately improve, and on November 21, 2000 plaintiff received a second Performance Counseling.  (See id. at 129-30; Ex. 17 to Stedman Dep.)  Plaintiff disagreed with this counseling and maintained that Lane was "nitpicking" and "micro-managing."[14] (See Stedman Dep. Vol. II at 130-135.)  After plaintiff received this second Performance Counseling, he again went to Lisa Milano and told her that he considered the counseling "for lack of a better word, harassment."  (See id. at 111-12.)

In December 2000 plaintiff learned of a job opening for a clerical position in the receiving department.  (See Stedman Dep. Vol. II at 26-27.)  Plaintiff then went and asked the manager of the receiving department how he felt about plaintiff working for him, and the manager informed plaintiff that he would be pleased to have plaintiff work in that department.  (See id. at 27, 31, 97.)  Plaintiff also informed Lane and Milano that he was interested in stepping down to the job of receiving clerk.  (See id. at 28, 30-31; Lane Dep. at 199-02; Milano Dep. at 50-51.)

---

[14]According to Plaintiff, other employees agreed with him that Lane was unreasonable in his expectations of all of the employees he supervised.  (See Stedman Dep. Vol. II at 116-19.)

11

Lane asked plaintiff if he was aware that the pay difference would be from $50,000 to approximately $18,000 in the clerical position. (See Stedman Dep. Vol. II at 29-30.) After plaintiff informed Lane that he was aware of the pay difference, Lane told plaintiff that he would check with "Corporate" about this possibility and get back with plaintiff at a later time. (See id. at 29.)

On December 11, 2000 Lane followed up on this conversation, and plaintiff voluntarily signed a letter providing that he wanted to be relieved of his responsibilities as industrial engineer because he felt that he could not meet the requirements of the position. (See id. at 32-33; Ex. 7 to Stedman Dep.) He requested a reassignment to the position of receiving clerk with an acknowledgment of the decrease in pay. (See id.) Both Lane and Milano told plaintiff that he would remain in his present job as an industrial engineer until OfficeMax found a replacement for him; after a replacement was found, he would then move to the clerical job in the receiving department. (See Stedman Dep. Vol. II at 36; Lane Dep. at 203-04; Milano Dep. at 54.) After plaintiff made the December 11, 2000 request, OfficeMax began searching for plaintiff's replacement. (See Stedman Dep. Vol. II at 181; Milano Dep. at 54-55.)

Plaintiff quit his job on January 4, 2001. (See Stedman Dep. Vol. II at 36-37.) That morning, Lane called plaintiff into his office and questioned plaintiff about his failure to work the preceding Saturday. (See id. at 37-38; Lane Dep. at 206-209.) He

12

told plaintiff that he was not a team player and informed him that as long as he was receiving pay to perform the job of industrial engineer, Lane expected plaintiff to perform all of the job's duties.  (See id.)

Later that morning, plaintiff interrupted Lisa Milano and informed her that "I've had all I can take."  (See Stedman Dep. Vol. II at 37; Milano Dep. at 55-56.)  Milano asked plaintiff if he was sure he wanted to quit and tried to persuade him to walk around the block or take a drive to calm down.  (See Stedman Dep. Vol. II at 39-40; Milano Dep. at 62-63.)  Plaintiff refused, packed up his personal belongings and left.  (See Stedman Dep. Vol. II at 41.)

Plaintiff applied for Social Security disability benefits in May of 2001 and is currently receiving these benefits.  (See Stedman Dep. Vol. I at 13-15; Ex. 2-3 to Stedman Dep.)  Plaintiff indicated in his application for disability benefits that he became unable to work because of his disabling condition on January 4, 2001; however, plaintiff testified at his deposition that he believed that he was disabled before this date.  (See Stedman Dep. Vol. I at 14-15; Ex. 2 to Stedman Dep.)

Plaintiff noted in a questionnaire provided to the Social Security Administration that he began having problems in September of 2000 and that he "had quit [his employment] because of depression and forgetfulness."  (See Stedman Dep. Vol. I at 16-19; Ex. 4 to Stedman Dep.)  Plaintiff also claims that he experienced hand tremors which at times prevented him from

typing, one of his job duties as an industrial engineer. (See Stedman Dep. Vol. I at 19-21.)  In the questionnaire, plaintiff indicated that he was able to care for his personal needs without assistance, that he shops for his personal needs, vacuums, washes dishes and mops, and cares for the dog. (See Ex. 4 to Stedman Dep.)  Additionally, plaintiff provided "I don't comprehend what I hear or read without having to go over something a couple of times or more." (See id.)

In another form completed as part of his application for Social Security disability benefits, plaintiff provided that he "had quit his job due to problems with memory and shakes . . . could not process daily job information." (See Stedman Dep. Vol. I at 22-23; Ex. 5 to Stedman Dep.)  Plaintiff explained that while at work he would often not know what task to perform next, that he would almost immediately forget what someone at work said, and that by eleven o'clock in the morning he was "burned out" from work. (See Stedman Dep. Vol. I at 23-24.)  Plaintiff stated that he stopped working because he "could not focus or retain job duties assignments." (See id. at 25-26; Ex. 5 to Stedman Dep.)

On January 9, 2001 plaintiff filed a charge of discrimination with the EEOC alleging age[15] and disability discrimination. (See Stedman Dep. Vol II at 47; Ex. 8 to Stedman Dep.) The EEOC issued a Dismissal and Notice of Right to Sue on

---

[15]Plaintiff, apparently, decided not to pursue the age discrimination claim alleged in the charge of discrimination to the EEOC.

April 4, 2001 (See Pl.'s October 15, 2001 Evidentiary

Submission.)  Plaintiff then filed this lawsuit on July 3, 2001

alleging that OfficeMax subjected him to a hostile work

environment and constructively discharged him in violation of the

American with Disabilities Act.  (See Stedman Dep. Vol. II at 9-

10, 119-121, 195-196.)

### IV. Applicable Substantive Law and Analysis

### A.  Hostile Work Environment Claim[16]

Plaintiff claims that he was harassed because of his

disability in violation of the ADA.  A claim for harassment based

on disability, like one under Title VII, requires a showing that:

(1) plaintiff belongs to a protected class; (2) he was subject to

---

[16]The Supreme Court has not expressly upheld a claim for
hostile work environment under the ADA.  The Third Circuit,
however, did accept such a claim.  See Fox v. Gen. Motors Corp.,
247 F.3d 169, 175-76 (4th Cir. 2001).  Other courts have
proceeded on the assumption that the ADA creates a cause of
action for a hostile work environment but avoided confirming that
the claim exists.  See, e.g., Walton v. Mental Heath Ass'n, 168
F.3d 661, 666-67 (3d Cir. 1999) ("we will assume this cause of
action without confirming it because [plaintiff] did not show
that she can state a claim."); Wallin v. Minnesota Dep't. of
Corrections, 153 F.3d 681, 687-88 (8th Cir. 1998) ("We will
assume, without deciding, that such a cause of action exists.");
McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th
Cir. 1998) (noting that various district courts have assumed the
claim's existence and assuming its existence in order to dispense
with appeal but stating that "[t]his case should not be cited for
the proposition that the Fifth Circuit recognizes or rejects an
ADA cause of action based on hostile environment harassment.").
Although the Eleventh Circuit has not directly addressed the
issue, district courts faced with claims of disability harassment
under the ADA have accepted such claims.  See, e.g., Johnston v.
Henderson, 114 F. Supp.2d 1341, 1360-61 (S.D. Fla. 2001); Bryant
v. Compass Bank, 1996 WL 529214 (N.D. Ala. May 31, 1996).
     The parties have assumed that such a claim exists and the
court will proceed on this assumption applying the same elements
of proof as applied to Title VII cases.

unwelcome conduct; (3) the harassment was based on his
disability; (4) the harassment was sufficiently severe or
pervasive to alter the terms and conditions of employment and
create a discriminatorily abusive working environment; and (5) a
basis for holding the employer liable.  See Gupta v. Florida Bd.
of Regents, 212 F. 3d 571, 582-83 (11th Cir. 2000) (citing
Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)).

### 1. Protected Class - Actual or Perceived Disability

Plaintiff claims defendant created a hostile work
environment because of his disability under 42 U.S.C. § 12101,
et. seq., the ADA.  Plaintiff, therefore, has the burden of
demonstrating that he belongs to the class of persons protected
by the ADA.  The ADA prohibits employers from discriminating
against a "qualified individual with a disability because of the
disability of such individual." 42 U.S.C. § 12112.  To be a
member of the protected class, plaintiff must have a
"disability."  The statute defines "disability" as one of the
following: "(A) a physical or mental impairment that
substantially limits one of more of the major life activities of
such individual; (B) a record of such an impairment; or (C) being
regarded as having such an impairment." 42 U.S.C. § 12102(2).
In his brief, plaintiff argues that he is disabled under the
first and third prong: he has a physical impairment that
substantially limits one or more of his major life activities

and/or defendant regarded him as having a disability.[17]

Prior to January 2002, case law made satisfaction of a prima facie case under the ADA, particularly meeting the "disability" prong, relatively simple.  On January 8, 2002, however, the Supreme Court significantly altered the definition of "substantially limits a major life activity."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681 (2002).

In Toyota the Supreme Court reversed the Sixth Circuit decision that found a former employee disabled because she could no longer perform all her manual tasks at work due to carpal tunnel syndrom.  See Toyota, 534 S.Ct. at 689.  Curtailing previous case law defining "major life activities," the Court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Id. at 691. Specifically, the Court stated that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives,[18] not whether the

_____

[17]In his complaint, plaintiff also argues he is disabled under the second prong but did not argue this in his brief. Notwithstanding this deficiency, plaintiff has not produced any evidence or any record that classifies or misclassifies him as having an impairment that substantially limits a major life activity.  See Hilburn v. Murata Electronics NA, Inc., 181 F.3d 1220, 1229 (11th Cir. 1999).

[18]The Court noted that testimony that the Toyota plaintiff could brush her teeth, wash her face, bathe, tend her garden, fix breakfast, do laundry, and pick up around the house was the very

claimant is unable to perform the tasks associated with her specific job." Id. at 693.

As a result, this decision creates additional obstacles for many plaintiffs in disability cases, particularly those alleging discrimination in the workplace.  Under Toyota it appears that courts now have greater discretion in determining what is a major life activity and what interference with that activity is substantial enough to constitute a disability.

Plaintiff cannot make out a prima facie case under the ADA because he has not produced evidence that satisfies the burden he bears of showing that he is in the class of persons protected by the ADA, i.e., a "disabled" person under Toyota. Plaintiff has not produced any evidence that his diabetes impeded his activities outside of the workplace in any way.  For example, plaintiff has not produced evidence that he cannot perform the type of manual tasks of central importance to daily life, such as brush his teeth, wash his face, fix breakfast, do laundry, and the like.  More importantly, in plaintiff's daily activities questionnaire that he completed for his Social Security disability application, plaintiff unequivocally states that his diabetes did not impede his activities outside the workplace. (See Ex. 4 to Stedman Dep. at 1-4.)  Plaintiff stated that he cares for his personal needs, including grooming, bathing, and dressing.  (See id. at 1.)  He shops for his personal needs,

---

type of evidence the Sixth Circuit should have focused on, as these seemed the type of manual tasks of central importance to people's daily lives.  See Toyota 122 S.Ct. at 693.

vacuums, washes dishes, mops, and cares for the dog.  (See id. at 2-3.)

As plaintiff admits that his diabetic condition does not inhibit his major life activities outside his job, the only possible major life activity as to which plaintiff could claim a substantial limitation is the life activity of working.  In analyzing such a disability claim, the Supreme Court has instructed that "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs."  Sutton v. United Air Lines, 527 U.S. 471, 491 (1999).  Although the Sutton plaintiffs alleged that their employer regarded their impairment as preventing them from working as global airline pilots, the Court held that disqualification from working in a single job does not support the claim that a plaintiff has a substantially limiting impairment.  See id. at 493.

In order to prevail, therefore, plaintiff must prove that his diabetes precluded him from a broad range of jobs.  See id. at 491; see also Pritchard v. Southern Co. Serv., 92 F.3d 1130, 1133 (11th Cir. 1996) (stating "nor does the inability to perform a single, particular job . . . constitute a substantial limitation in the major life activity of working").  He has come forward with no such proof.  Indeed, by his own testimony, plaintiff cannot meet this standard.  Plaintiff testified that he believed he could perform the job of receiving clerk.  (See Stedman Dep. Vol. II at 181-83.)  This testimony indicates that

plaintiff's impairment only precluded him from performing his particular job as an industrial engineer.[19]  Under the Supreme Court's holding in <u>Sutton</u>, this evidence is insufficient to invoke the protection of the ADA.

The fact that plaintiff attempts to bring his claim within the ADA's ambit by arguing that he satisfies the "regarded as" prong does not alter the preceding analysis.  The court recognizes that "[a]s with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of an individual." <u>Hilborn v. Murata Electronics NA, Inc.</u>, 181 F.3d 1220, 1230 (11th Cir. 1999)(citing <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1327 (11th Cir. 1998)).  At best, plaintiff's only evidence that defendant regarded him as substantially impaired in major life activity pertains to the life activity of working.

To show that he was regarded as substantially limited in his ability to work, plaintiff must "prove that [defendant] considered [him] as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills and abilities.'" <u>Cash v. Smith</u>, 231 F.3d 1301, 1306 (11th Cir. 2000).  Plaintiff's only evidence that defendant regarded him as disabled is Lane's sole comment to plaintiff that

---

[19]Additionally, on December 11, 2000 plaintiff signed a letter stating that he could not meet the requirements of the position as industrial engineer and requesting that he be considered for the position of receiving clerk.  (<u>See</u> Ex. 7 to Stedman Dep. Vol. II.)

"he didn't want to be responsible for affecting someone's health." (Stedman Dep. Vol. II at 93-96.) Plaintiff does not explain how this proves that his employer regarded him as disabled under the ADA. OfficeMax agreed to transfer plaintiff to the receiving clerk position three weeks before he quit his job. (See id. at 35-36; Ex. 7 to Stedman Dep.) In addition, plaintiff testified that Lane never made reference to the fact that plaintiff was diabetic or a liver transplant recipient while talking about his job performance. (See Stedman Dep. Vol. II at 93.) Therefore, under the Eleventh Circuits holdings, plaintiff cannot establish that his employer regarded him as substantially impaired in major life activity.

For the foregoing reasons, plaintiff has failed to establish the first element of a prima facie case under the ADA by failing to come forward with evidence demonstrating that he is in the class of persons protected by the ADA.

### 2. Severe and Pervasive

Even assuming that plaintiff was harassed on the basis of a disability or perceived disability, plaintiff has not produced evidence sufficient to demonstrate that any harassment he faced was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." See Gupta, 212 F.3d at 582-83. This requirement tests the legitimacy of most harassment claims and is therefore regarded as crucial. See id. at 583 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998)). The "'mere utterance of an . . . epithet which

21

engenders offensive feelings of an employee' . . . does not
sufficiently affect the conditions of employment." <u>Harris v.
Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)(quoting <u>Meritor
Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).  Only when
a workplace is "permeated with 'discriminatory intimidation,
ridicule, and insult' that is 'sufficiently severe to alter the
conditions of the employment and create an abusive working
environment'" is the law violated.  <u>Harris</u>, 510 U.S. at 21
(quoting <u>Meritor</u>, 477 U.S. at 65-66)).

     Accordingly, in order to establish that harassing conduct
was sufficiently severe or pervasive to alter an employee's terms
or conditions of employment, the employee must meet both a
subjective and objective test.  <u>See</u> <u>Mendoza</u>, 195 F.3d at 1246.
The employee must establish not only that he subjectively
perceived the environment as hostile, but also that a reasonable
person would perceive the environment to be hostile and abusive.
<u>Watkins v. Bowden</u>, 105 F.3d 1344, 1355-56 (11th Cir. 1997).  The
objective severity of harassment should be judged from the
perspective of a reasonable person in the employee's position,
considering all the circumstances.  <u>Id.</u>  <u>See</u> <u>Oncale v. Sundowner
Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).

     Although the court examines the statements and conduct
complained of collectively in determining whether they were
sufficiently pervasive or severe to constitute disability
harassment, the statements or conduct must be related to
plaintiff's disability or perceived disability.  <u>See</u> <u>Gupta</u>, 212

F.3d at 583 (stating in sexual harassment cases "the statements
and conduct must be of a sexual or gender-related nature . . .
before they are considered in determining whether the severe or
pervasive requirement is met.") Isolated and innocuous incidents,
even if intentional, will not support a hostile environment claim
and are not counted.  See id.

    Plaintiff claims that Lane "harassed" and "threatened" him
in front of a group of employees by asking plaintiff a question
and showing disgust when plaintiff did not know the answer and
stopping by plaintiff's office and asking in a loud voice if
plaintiff had completed certain projects.  (See Stedman Dep. Vol.
II at 87-92; Ex. 9 to Stedman Dep.)  Plaintiff additionally
claims that Lane once timed plaintiff on his ability to finish a
computer system entry.  (See id. at 88-89.)  There is no evidence
suggesting that this conduct, although upsetting to plaintiff,
related in any way to plaintiff's claimed disability so as to
fall in the category of disability-harassing behavior.  Further,
even if there were such evidence, this conduct falls far, far
short of that required to satisfy the "severe or pervasive"
element.

    The only comment that is even arguably related to
plaintiff's disability is Lane's comment that he was not "going
to be responsible for affecting somebody's health."  (See Stedman
Dep. Vol. II at 93-96.)  This comment, standing alone or
considered along with all other evidence, does not establish that
the harassing conduct was sufficiently severe or pervasive to

alter the plaintiff's terms or conditions of employment.  Thus,
plaintiff also has failed to establish a <u>prima</u> <u>facie</u> case by
failing in his burden to produce evidence that any harassment he
faced was "sufficiently severe or pervasive to alter the
conditions of employment and create an abusive working
environment."  <u>See</u> <u>Gupta</u>, 212 F.3d at 582-83.

### 3.   Inconsistencies in his ADA claim and Social Security disability claim.

An applicant for Social Security disability benefits must
establish that he is disabled under the Social Security Act and
thus "not only unable to do his previous work but cannot . . .
engage in any other kind of substantial gainful work which exists
in the national economy."  42 U.S.C. § 423(d)(2)(A).  However,
under the ADA, a plaintiff must establish that he is a "qualified
individual with a disability" who is unable to "perform the
essential functions" of his job "with or without a reasonable
accommodation" from his employer.  42 U.S.C. § 12111(8).  At
first glance, a claim of total disability under Social Security
Disability Insurance ("SSDI") might seem fundamentally
inconsistent with status as a qualified individual under the ADA;
however, a plaintiff may declare that he was totally disabled in
his SSDI application and then declare that he was a qualified
individual under the ADA if he shows that this apparent
inconsistency can be resolved.  <u>See</u> <u>Cleveland v. Policy</u>
<u>Management Systems, Corp.</u>, 526 U.S. 795, 805-06 (1999).  The
Supreme Court held that though filing an application for Social

24

Security disability benefits does not necessarily preclude a
plaintiff from bringing an ADA claim, the plaintiff must proffer
a sufficient explanation of any apparent inconsistencies between
the ADA claim and sworn statements made in an application for
disability benefits.  See id.

Plaintiff argues that his claim of disability in his
application for SSDI benefits does not preclude him from
establishing that he was a qualified individual under the ADA.
He also contends that the disability application did not take
into account the prospect of accommodation as contemplated under
the ADA.  Plaintiff testified in his deposition that he filed for
Social Security benefits in May of 2001.  (See Stedman Dep. Vol.
I at 13-15; Ex. 2-5 of Stedman Dep.)  Plaintiff further testified
that he currently receives monthly disability payments.  (See
Stedman Dep. Vol. II at 9.) In addition, plaintiff testified that
he believed that he became disabled in September of 2000.[20]  In
his SSDI application Stedman swore that he was disabled and
unable to work.  (See Ex. 2 to Stedman Dep.)  Stedman now claims,
however, that he was able to work during the time that he was
employed at OfficeMax.  This statement clearly contradicts his
claim of disability in his SSDI application.  Plaintiff has
failed to present a sufficient explanation of the contradiction
between his statement before the SSA and his statements in

_____

[20]His SSDI application indicates that he became unable to
work because of his disabling condition as of January 4, 2001.
Plaintiff testified, however, that "they set that date because
that was the last day I worked" but that he considered himself
disabled before that date.  (See Stedman Dep. Vol. I at 15-17.)

connection with his ADA claim.

For each of the foregoing reasons, separately, defendant is entitled to summary judgment on plaintiff's hostile work environment ADA claim.

### B. Constructive Discharge Claim

In addition to his claim of hostile work environment, plaintiff alleges that defendant constructively discharged him on the basis of his disability.  After discussing in section IV.A.1., _supra_, plaintiff's hostile work environment claim, the court concluded that claim failed because plaintiff has not shown himself to be in the ADA protected class.  His ADA constructive discharge claim fails for the same reason.  But the constructive discharge claim also fails for an additional independent reason. "The threshold for establishing constructive discharge . . . is quite high."  _Hipp v. Liberty Nat'l Life Ins. Co._, 252 F.3d 1208, 1231 (11th Cir. 2001).  To establish constructive discharge, plaintiff must prove that working conditions were "so intolerable that a reasonable person in [his] position would have been compelled to resign." _Griffin v. GTE Florida, Inc._, 182 F.3d 1279, 1283 (11th Cir. 1999).  Moreover, "the standard for proving constructive discharge is higher than the standard for proving a hostile work environment claim." _Hipp_, 252 F.3d at 1231 (citing _Landgraf v. USI Film Prods._, 968 F.2d 427, 430 (5th Cir. 1992)("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum requirement to prove a hostile working

26

environment.")).

In assessing a constructive discharge claim, the plaintiff's subjective feelings about his employer are not considered.  <u>See</u> <u>Hipp</u>, 252 F.3d at 1231.  Rather, the court employs an objective standard: whether a reasonable person in the plaintiff's position would have been compelled to resign.  <u>See Doe v. DeKalb County</u> <u>Sch. Dist.</u>, 145 F.3d 1441, 1450 (11th Cir. 1998).  A plaintiff "must show more than the working conditions were not to [his] liking; [he] must prove that the alleged intolerability of working conditions resulted from acts of discrimination." <u>Schwetfager v. City of Boynton Beach</u>, 42 F. Supp. 2d 1347, 1367 (S.D. Fla. 1999); <u>Carr v. Cohen</u>, 44 F. Supp. 2d 1240, 1246 (M.D. Ala. 1999)(holding that to succeed on constructive claim, plaintiff must show both that the employer's actions were impermissibly motivated and that these actions made plaintiff's working conditions so intolerable that her resignation is deemed involuntary).

Plaintiff is unable to meet this rigorous standard. Plaintiff maintains that he was forced to resign, but offers no objective basis for this subjective belief.  Plaintiff's testimony clarifies that the essence of his constructive discharge claim is the stress he experienced performing his job duties and working under his supervisor, Kevin Lane.[21]  The court

---

[21]Additionally, the court notes plaintiff's statements in his application for Social Security disability benefits indicate that plaintiff quit because of medical reasons that did not subside after leaving his job at OfficeMax (<u>See</u> Stedman Dep. Vol. I at 16-19; Ex. 4 to Stedman Dep.)

concludes that these conditions were not so intolerable as to force a reasonable person to resign, hence, falling far short of the required threshold.  Therefore defendant is entitled to summary judgment in its favor on plaintiff's constructive discharge claim.

In summary, the Court finds that no material issues of fact remain and that defendant Bizmart, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.

DONE this 3rd day of September, 2002.

SENIOR UNITED STATES DISTRICT JUDGE

28